## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ZINA D. HUNTER**<br>2456 Elvans Road, S.E.<br>Washington, DC  20020,<br><br>            **Plaintiff,**<br><br>**v.**<br><br>**DISTRICT OF COLUMBIA**<br>1350 Pennsylvania Avenue, N.W.<br>Washington, DC  20004,<br><br>            **Defendant.** | Civil Action No. 1:08CV_____<br><br><br>JURY TRIAL DEMAND |

## COMPLAINT

For her complaint, Plaintiff Zina D. Hunter, by and through her undersigned counsel, alleges as follows:

### NATURE OF THIS ACTION

1.     This is an action to recover monetary damages and to obtain injunctive relief for the sexual harassment and retaliation suffered by the Plaintiff, Zina D. Hunter, while employed by the District of Columbia's Department of Youth Rehabilitation Services.

### JURISDICTION

2.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(f)(3).

### VENUE

3.     Venue properly lies within this District under Title VII, 42 U.S.C. § 2000e-5(f)(3), because Defendant District of Columbia is located within this judicial district.

## PARTIES

4.       Plaintiff Zina D. Hunter ("Plaintiff" or "Hunter") is a citizen of the District of Columbia and resides at 2456 Elvans Road, S.E., Washington, DC 20020.  Plaintiff is female.

5.       Defendant District of Columbia is a municipal government and corporation with its principal office located at 1350 Pennsylvania Avenue, N.W., Washington, DC 20004.  The District of Columbia Department of Youth Rehabilitation Services ("DYRS") is a subordinate agency of Defendant District of Columbia and an "employer" within the meaning of 42 U.S.C. § 2000e(b).

## ADMINISTRATIVE PROCEEDINGS

6.       Hunter has the right under the District of Columbia Human Rights Act, D.C. Code §§ 2-1403.03(b), 2-1403.16 (the "DCHRA"), to bring this private cause of action for violations of the DCHRA, without the necessity of exhausting any particular administrative remedy available to her.

7.       Hunter did, however, file timely complaints with the District of Columbia Office of Human Rights ("OHR") in 2004 and 2005.  After investigating Hunter's complaints, OHR issued the Second Letter of Determination After Reopening on January 29, 2008 (the "Letter of Determination").  The Letter of Determination is attached hereto as Exhibit 1.  In the Letter of Determination, OHR found probable cause to believe that DYRS subjected Hunter to a hostile work environment on the basis of her sex (female) beginning in April 2003, shortly after Hunter began working at DYRS.  *See* Ex. 1 at 20.  Further, OHR found probable cause to believe that Hunter was subjected to retaliation when, in January 2004, after refusing and complaining about being repeatedly sexually harassed, Hunter was not given any major responsibilities or

assignments, was required to write a letter of apology, and then on April 28, 2004, was transferred to DYRS's Superior Court At Risk Unit. *See* Ex. 1 at 20.

8. Contemporaneous with the filing of her two OHR complaints in 2004 and 2005, Hunter filed timely charges with the United States Equal Employment Opportunity Commission (the "EEOC"). On November 19, 2007, the EEOC issued Hunter two notices of her right to sue in federal court. The EEOC's right-to-sue letters are attached hereto as Exhibit 2.

9. Hunter has satisfied all conditions precedent to the filing of this action, including commencing this action within ninety days of receiving EEOC's notifications of her right to sue.

## FACTS

10. DYRS provides citywide services for delinquency prevention and control. Specifically, DYRS provides security, supervision, and residential and community support services for committed and detained juvenile offenders and juvenile persons in need of supervision.

11. From February 2003 through September 2005, Hunter was employed by DYRS as a Supervisory Correctional Officer ("SCO") at the Oak Hill Youth Center ("Oak Hill") and at the Superior Court At Risk Unit (the "At Risk Unit"). Both are DYRS secure facilities.

12. Prior to February 2003, Hunter had at least eighteen (18) years of time-in-service with the District of Columbia.

13. While employed at Oak Hill, Hunter received one written evaluation — a rating of "Excellent." Hunter was known by her co-workers as an outstanding employee who often exceeded what was required of her as an SCO. *See, e.g.*, Ex. 1 at 8. She was competent, qualified, and professional. *See, e.g.*, Ex. 1 at 9.

14.     In 2003, after only a short time at Oak Hill, Hunter's immediate supervisor, Nathaniel Williams ("Williams"), informed Hunter that she was doing such a good job that he was considering promoting her.  Williams told Hunter that he was going to put her in charge of the Trudy Wallace Pre-Release House, another DYRS facility.

15.     Once Hunter reported to Williams and others that she had been sexually harassed, she no longer received positive recommendations from Williams or any other DYRS supervisor, and discussions regarding her promotion ceased.

## I.     CHAPLAIN COLE'S REPEATED SEXUAL HARASSMENT

16.     Beginning in April 2003, Hunter began receiving frequent phone calls from Chaplain Edward Cole ("Chaplain Cole") — the Oak Hill Chaplain.

17.     Chaplain Cole would ask Hunter to leave her post and visit him in his office.  As time went on, Chaplain Cole became increasingly aggressive with Hunter, on the phone and in person, and his remarks to her became more and more inappropriate.

18.     Among other things, Chaplain Cole often:  (i) discussed having sex with Hunter; (ii) referred to his penis when speaking with her; (iii) grabbed Hunter's waist, rear end, and breasts; and (iv) referred to her as "baby" in front of other employees.

19.     Under the auspices of "spiritual counseling" or "praying together," Chaplain Cole repeatedly invited Hunter into his office where he would touch her inappropriately and make lewd comments about her physical appearance and his desire to have a sexual relationship with her.

20.     Almost the entire time Hunter was employed at Oak Hill, her immediate supervisor was Williams.

21.     Hunter complained repeatedly to Williams about Chaplain Cole's inappropriate behavior and sexual misconduct.

4

22.     In addition to receiving Hunter's grievances, Williams also witnessed Hunter being sexually harassed by Chaplain Cole.

23.     On one occasion, Williams called Hunter to his office.  When she arrived, Chaplain Cole was already there.  Chaplain Cole said to Williams, "Man, don't you want to see how fat her booty is?"  Williams smiled and asked Hunter to sign her job performance rating.  Williams did not reprimand Chaplain Cole or even address Chaplain Cole's comment, even though Hunter was visibly upset by Chaplain Cole's remark.

24.     Despite Hunter's continuous complaints about Chaplain Cole's behavior, Williams neither investigated those complaints nor reprimanded Chaplain Cole, even after witnessing his inappropriate conduct.

25.     At one point, Williams told Hunter that he was not going to do anything about Chaplain Cole's behavior and that Hunter would have to "handle it" herself.  In response, Hunter told Williams that she was going to file a formal charge of harassment against Chaplain Cole.  Williams replied that if Hunter filed a formal complaint, she would "suffer the consequences."

## II.    LAVERN EVANS'S REPEATED SEXUAL HARASSMENT AND THREATS

26.     The sexual harassment Hunter endured at Oak Hill was not limited to Chaplain Cole.  LaVern Evans ("Evans"), among others, also participated in the harassment.  While Hunter was employed at DYRS, Evans was an SCO at Oak Hill, and he was eventually promoted to Acting Superintendent.  Upon information and belief, Evans is still employed by DYRS at Oak Hill.

27.     Evans repeatedly, overtly, and aggressively propositioned Hunter for sex.  When Hunter said no and asked him to stop harassing her, Evans refused and became angry.  Evans also verbally harassed Hunter on several occasions.

28.     Hunter reported Evans's harassment to Williams and George Perkins.  At that time, Mr. Perkins was the Oak Hill Superintendent.  Far from ending the harassment, Hunter's complaint caused her to endure additional harassment and threats from Evans.  After telling Hunter that they would take care of Evans's behavior, Williams and Mr. Perkins simply relayed Hunter's complaint to Evans.  Upon learning of Hunter's sexual harassment complaint against him, Evans approached Hunter in a rage, stating:  "You don't know who you're messing with. Anything you tell people, I'm going to find out."  Evans then threatened Hunter, stating:  "I'm going to get you.  It may not be today.  It may not be tomorrow.  But I'm going to get you."

29.     Evans later carried through with his threat.  Soon after being promoted to Acting Superintendent, Evans recommended that Hunter be terminated from Oak Hill.  DYRS admitted in a prior administrative proceeding that it was Evans who recommended Hunter's termination.

## III.    DYRS MANAGEMENT'S RETALIATION AGAINST HUNTER

30.     As a direct result of her sexual harassment complaints, Hunter was retaliated against.  This retaliation included, but was not limited to, a demotion in responsibilities and duties, a transfer to a facility with less opportunities for advancement, and her eventual employment termination.

### A.    Hunter Was Retaliated Against While At Oak Hill

31.     The work Williams assigned to Hunter deteriorated once Hunter started complaining about Evans's and Chaplain Cole's sexual harassment.  Upon information and belief, DYRS's normal practice was to only reassign SCOs within Oak Hill when they were promoted.  Contrary to that practice, Hunter was reassigned thirteen (13) times to different stations within Oak Hill, all without being promoted.  Hunter's movements were constantly monitored on and off the Oak Hill campus by DYRS management.  DYRS refused to respond to

Hunter's requests for maintenance and assistance in her unit, and refused to incorporate Hunter's recommendations for improving Oak Hill.

32.    Hunter was never assigned to the Shift Commander position at Oak Hill. Often, other SCOs with less experience than Hunter and even subordinate Correctional Officers ("COs") were assigned to the Shift Commander position while Hunter was on duty.

33.    Ultimately, Hunter was transferred to the At Risk Unit shortly after Williams threatened Hunter with "consequences" if she filed formal sexual harassment claims. Hunter's assignment to the At Risk Unit was a *de facto* demotion and represented a drastic downgrade from Hunter's previous assignments at Oak Hill. Among other things:

    a.    Hunter went from supervising 12-15 staff members to supervising 4;

    b.    Hunter worked more hours for the same pay;

    c.    Hunter no longer had an office;

    d.    The conditions at the At Risk Unit were filthy. Her work environment was a small, cramped, underground, poorly ventilated area in the basement of the courthouse. Occasionally, Hunter would develop a skin rash because of the dilapidated conditions and poor ventilation;

    e.    Hunter no longer had access to a government car;

    f.    It was more difficult for Hunter to travel to work, as she now needed to locate and pay for parking;

    g.    Hunter no longer had opportunities for the training necessary for advancement;

    h.    There was insufficient staff to complete duties; and

    i.    The quality of her supplies was significantly reduced.

34.    When Hunter requested a transfer from the At Risk Unit, her request was denied.

**B.    Hunter Was Ultimately Fired In Retaliation For Her Complaints**

35.    As explained in paragraphs 26 through 29, Evans threatened Hunter several times, once promising: "I'm going to get you.  It may not be today.  It may not be tomorrow.  But I'm going to get you."    Evans carried through with his threat by recommending Hunter's employment termination.    This action was a direct result of Hunter's sexual harassment complaints about Evans.

36.    Hunter's employment with DYRS was terminated on September 2, 2005.

37.    On May 24, 2006, in a "Determination By Claims Examiner," the District of Columbia Department of Employment Services found that Hunter was not discharged for misconduct.  DYRS has provided three different reasons for Hunter's termination.  DYRS represented to the OHR investigator considering Hunter's sexual harassment complaints that Hunter was terminated as a result of ongoing performance and behavioral issues.  Elsewhere, DYRS told the OHR investigator that Hunter was terminated because of misappropriation of government resources.  Hunter's formal termination documents, however, state that she was terminated as a result of a "RIF" — a reduction in force.

38.     As a result of constant and pervasive sexual harassment, motivated by actual malice, and uniformly accepted, condoned, and approved by DYRS's management, Hunter was stressed, depressed, and emotionally scarred.  As a result of being put down and humiliated by her colleagues, Hunter was uncomfortable confiding in others and had difficulty speaking with friends and family.  As a result of Evans's threats, Hunter was scared of being physically assaulted, having her car vandalized, and losing her job.

**IV.    THE ABSENCE OF A SEXUAL HARASSMENT POLICY AT OAK HILL**

39.    During Hunter's entire tenure at Oak Hill and at the At Risk Unit, from 2003 through 2005, sexual harassment at Oak Hill was pervasive and shocking to all ordinary notions of acceptable conduct for the workplace.

40.    Several of Hunter's co-workers provided sworn affidavits to OHR corroborating Hunter's assertions that sexual harassment was rampant at Oak Hill. *See* Ex. 1 at 9. As set forth in the Letter of Determination:

> [A]s several witnesses attested, Oak Hill's environment was toxic. Witnesses described "rampant sexual harassment;" the absence of any formal ethics advisor, complaint procedure or sexual harassment training at Oak Hill; rampant fraternization among COs, SCOs, and other supervisors at Oak Hill; the recent adoption of sexual harassment training and "rampant and uncontrolled sexual harassment" at Oak Hill from 2003-2005; and verbal threats and harassment by employees. Even [DYRS's] Director [Vincent Schiraldi] admitted in 2006 that he was "deeply committed to reforming this long-troubled department."

Ex. 1 at 7.

41.    Likewise, "[a]ny time a new female employee joined the Oak Hill staff, the male employees would take bets on who would have sex with her first." Ex. 1 at 9.

42.    In one instance, an Oak Hill CO was directed by his supervisor to retaliate against a female employee who complained about being sexually harassed. *See* Ex. 1 at 9. That retaliation consisted of downgrading the female employee's evaluation of "Excellent" after she complained about being sexually harassed.

43.    Later, Evans ordered Linda Cruz-Packer, the Acting Shift Commander, to "find something to write [that same Oak Hill CO] up for," so that Evans could fabricate a reason to terminate him. Evans then specifically instructed Ms. Packer to write that CO up for abandonment of post, without provocation.

44.    Not until the Mayor's Order of October 20, 2004, did DYRS create a Sexual

Harassment Policy.  *See* Ex. 1 at 16-17.  That policy was implemented at Oak Hill on November

12, 2004, but the training of Oak Hill employees concerning the policy was not carried out until

late-2006 or early-2007.

45.    For almost two years, Hunter worked for DYRS without the protection of ***any***

sexual harassment policy.  At no time during her employment at DYRS did Hunter or any other

DYRS employee receive training on what constituted sexual harassment or how to report such

harassment.

### Count I (Hostile Work Environment Sexual Harassment)
**Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e, *et seq.***

46.    Hunter refers to, and incorporates by reference, the allegations contained in

paragraphs 1 through 45 of this complaint as if they were repeated here in full.

47.    Title VII of the Civil Rights Act of 1964 provides in pertinent part that it shall be

an unlawful employment practice for an employer:

> (1) to fail or refuse to hire or to discharge any individual, or
> otherwise to discriminate against any individual with respect to his
> compensation, term, conditions, or privileges of employment,
> because of such individual's race, color, religion, sex, or national
> origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for
> employment in any way which would deprive or tend to deprive
> any individual of employment opportunities or otherwise adversely
> affect his status as an employee, because of such individual's race,
> color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a) (2008).

48.    Defendant District of Columbia is a "person" within the meaning of 42 U.S.C. §

2000e(a) and an "employer" within the meaning of 42 U.S.C. § 2000e(b).

49.     At all pertinent times, Hunter was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).

50.     Defendant District of Columbia discriminated against Hunter on the basis of her sex, in violation of section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), by subjecting Hunter to sexual harassment, thereby creating a hostile work environment that adversely affected the terms, conditions, and privileges of her employment, and by failing and/or refusing to take appropriate action to remedy the effects of the discriminatory treatment.

51.     As described above, Hunter was subjected to unwelcome harassment, ridicule, and other abusive conduct.

52.     That abusive conduct was motivated, at least in part, by Hunter's gender.

53.     That abusive conduct was so severe and pervasive that both Hunter herself and a reasonable person in Hunter's position would find her work environment so hostile or offensive that it would interfere with her work performance.

54.     During the majority of the time she was employed at DYRS, DYRS had no sexual harassment policy.  At no time during her employment at DYRS did Hunter or any other Oak Hill employee receive sexual harassment training.  After "implementing" a sexual harassment policy in late-2004, training was not provided to Oak Hill employees until late-2006 or 2007.

55.     DYRS management was aware of the abusive conduct suffered by Hunter.

56.     The conduct of Defendant District of Columbia, by and through the conduct of its employees and/or agents, deprived Hunter of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.

## Count II (Hostile Work Environment Sexual Harassment)
### Violation of the District of Columbia Human Rights Act
### D.C. Code §§ 2-1401.01, *et seq.*

57.    Hunter refers to, and incorporates by reference, the allegations contained in paragraphs 1 through 56 of this complaint as if they were repeated here in full.

58.    The DCHRA prohibits discrimination in employment "for any reason other than that of individual merit," including sex discrimination, and makes it "an unlawful discriminatory practice" for an employer to discriminate in employment "wholly or partially" for one of the proscribed discriminatory reasons.

59.    Defendant District of Columbia discriminated against Hunter on the basis of her sex, in violation of the DCHRA, by subjecting Hunter to sexual harassment, thereby creating a hostile work environment that adversely affected the terms, conditions, and privileges of her employment, and by failing and/or refusing to take appropriate action to remedy the effects of the discriminatory treatment.

60.    The conduct of Defendant District of Columbia, by and through the conduct of its employees and/or agents, deprived Hunter of her rights under the DCHRA.

61.    During the majority of the time she was employed at DYRS, DYRS had no sexual harassment policy.  At no time during her employment at DYRS did Hunter or any other Oak Hill employee receive sexual harassment training.  After "implementing" a sexual harassment policy in late-2004, training was not provided to Oak Hill employees until late-2006 or 2007.

62.    In permitting the sexual harassment, Defendant District of Columbia discriminated against Hunter wholly or partially because of her sex, in violation of the DCHRA.

**Count III (Retaliation)**
**Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e-3**

63.     Hunter refers to, and incorporates by reference, the allegations contained in paragraphs 1 through 62 of this complaint as if they were repeated here in full.

64.     Title VII of the Civil Rights Act of 1964 forbids an employer from retaliating against an employee because of the employee's opposition to any practice made an unlawful practice by Title VII.  *See* 42 U.S.C. § 2000e-3 (2008).

65.     The conduct of Defendant District of Columbia, by and through the conduct of its employees and/or agents, deprived Hunter of her rights under 42 U.S.C. § 2000e-3, and constituted an improper adverse employment action that resulted in a demotion in her job responsibilities and the eventual termination of her employment.

66.     As described above in paragraphs 21 through 25 and 28, Hunter repeatedly reported being sexually harassed, specifically informing her immediate supervisor, Nathaniel Williams, of Chaplain Edward Cole's and LaVern Evans's harassing and threatening behavior.

67.     Defendant District of Columbia was aware of Hunter's complaints.

68.     As described above in paragraphs 30 through 38, after reporting the harassing conduct to Defendant, Hunter was subjected to adverse employment actions.  These actions included, but were not limited to:  (1) being repeatedly reassignment; (2) having her movements on and off the premises constantly monitored; (3) being transferred to the At Risk Unit; and (4) eventually being fired.

69.     Hunter was also subjected to threats by Evans, one of her harassers.  Delivering on a previous threat, Evans was the DYRS employee who recommended Hunter's employment termination.

70.    Defendant District of Columbia took these adverse actions, at least in part, because of Hunter's complaints.

<b><u>Count IV (Retaliation)</u></b><br>
<b>Violation of the District of Columbia Human Rights Act</b><br>
<b>D.C. Code §§ 2-1401.01, <i>et seq.</i></b>

71.    Hunter refers to, and incorporates by reference, the allegations contained in paragraphs 1 through 70 of this complaint as if they were repeated here in full.

72.    The DCHRA forbids an employer from retaliating against an employee because of the employee's opposition to any practice made unlawful by the DCHRA.

73.    The conduct of Defendant District of Columbia, by and through the conduct of its employees and/or agents, deprived Hunter of her rights under the DCHRA, and constituted an improper adverse employment action that resulted in a demotion of her job responsibilities and the eventual termination of her employment.

<b>DEMAND FOR RELIEF</b>

WHEREFORE, Plaintiff Zina D. Hunter respectfully prays for an order of this Court:

1.    Entering a declaratory judgment that holds that:

   i.    With respect to Counts 1 and 3: (a) the District of Columbia violated Zina D. Hunter's rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a); (b) that violation injured Zina D. Hunter; and (c) as a result, Zina D. Hunter is entitled to just and full compensation in an amount to be determined at trial;

   ii.    With respect to Counts 2 and 4: (a) the District of Columbia violated Zina D. Hunter's rights under the DCHRA, D.C. Code §§ 2-1401.01, <i>et seq.</i>; (b) that violation injured Zina D. Hunter; and (c) as a result, Zina D.

Hunter is entitled to just and full compensation in an amount to be determined at trial;

2.    Enjoining Defendant District of Columbia from failing or refusing to provide sufficient remedial relief to Zina D. Hunter to make her whole for the losses she suffered as a result of the discrimination inflicted upon her as alleged in this Complaint;

3.    Enjoining the District of Columbia from discriminating against employees who report discriminatory practices under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), and the DCHRA, D.C. Code §§ 2-1401.01, *et seq.*;

4.    Reinstating Hunter to her previous position as a Supervisory Correctional Officer with DYRS, with appropriate employee seniority, rank, and entitlements;

5.    Awarding compensatory damages to Zina D. Hunter to fully compensate her for the injuries caused by the District of Columbia's discriminatory and retaliatory conduct, in an amount to be determined at trial;

6.    Awarding punitive damages to Zina D. Hunter for the District of Columbia's malicious and wrongful discrimination, in an amount to be determined at trial;

7.    Awarding attorney's fees and expenses incurred in bringing this action; and

8.    Granting such other and further relief as the Court deems just and warranted.

## JURY TRIAL DEMAND

Plaintiff Zina D. Hunter demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

Dated:  February 15, 2008

Respectfully submitted,

**WHITE & CASE** LLP

Dana E. Foster (D.C. Bar No. 489007)
Christopher Macchiaroli (D.C. Bar No. 491825)
701 Thirteenth Street, N.W.
Washington, DC  20005
Tel.:  (202) 626-3600
Fax:  (202) 639-9355

*Counsel for Plaintiff Zina D. Hunter*

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Zina D. Hunter | District of Columbia |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    11001 (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    11001 (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) Dana E. Foster (DC Bar No. 489007) Christopher Macchiaroli (DC Bar No. 491825) White & Case LLP 701 Thirteenth Street, N.W. Washington, DC 20005 Tel.: (202) 626-3600; Fax: (202) 639-9355 | ATTORNEYS (IF KNOWN) Office of the Attorney General 441 Fourth Street, N.W., Suite 1060N Washington, DC 20004 Tel.: (202) 727-3400; Fax: (202) 347-8922 |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

- ☐ 410 Antitrust

○ **B. Personal Injury/Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. Habeas Corpus/ 2255 | ◉ H. Employment Discrimination | ○ I. FOIA/PRIVACY ACT | ○ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ○ M. Contract | ○ N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; DCHRA, D.C. Code §§ 2-1401.01, et seq., Action for Sexual Harassment and Retaliation

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 ☐ | DEMAND $ 1,000,000.00 | Check YES only if demanded in complaint |
|---|---|---|---|
| | | JURY DEMAND: | YES ☒  NO ☐ |

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE February 15, 2008   SIGNATURE OF ATTORNEY OF RECORD _[signature]_

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C.,  and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint.  You may select only one category.  You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

Exhibit 1

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**OFFICE OF HUMAN RIGHTS**



Judiciary Square Office
441 4ᵗʰ Street, NW Suite 570N
Washington, DC 20001
Phone: (202) 727-4559 • Fax: (202) 727-9589

Penn Branch Office
3220 Pennsylvania Avenue, SE, 1st Fl
Washington, DC 20020
Phone: (202) 727-4559 • Fax: (202) 645-6390

## SECOND LETTER OF DETERMINATION
## AFTER REOPENING

January 29, 2008

Zina Hunter
c/o Dana E. Foster, Esq.
White & Case, LLP
701 Thirteenth Street, N.W.,
Washington, D.C. 20001

RE:     ***Zina Hunter v. D.C. Department of Human Services (Youth
        Rehabilitation Services)[1]***
        ***Docket No.  04-410-DC (CN)***
        ***EEOC No: 10CA400331***

Dear Ms. Hunter:

The District of Columbia Office of Human Rights (hereinafter referred to as "OHR") has completed the investigation of the above referenced complaint.  You are hereinafter referred to as "**COMPLAINANT.**"  D.C. Department of Youth Rehabilitation Services, the agency which employed you is hereinafter referred to as "**RESPONDENT.**"

## ISSUES PRESENTED

(1) Whether Complainant was subjected to a hostile work environment on the basis of sex (female) beginning April 2003 when Respondent's Chaplain and Supervisor (male) made sexually suggestive comments and advances.

(2) Whether Complainant was subjected to a hostile work environment on the bases religion (Jehovah Witness); age (40); marital status (single); and family responsibilities (children) when beginning April 2003, Respondent's Chaplain allegedly told Complainant that she was going to hell because of her religion; questioned her about her familial status; and spoke negatively about her in front of others.

---

[1] The Office of the Attorney General for the District of Columbia indicates in its March 20, 2007 correspondence, that the correct Respondent on the above-referenced Charge should read the D.C. Department of Youth Rehabilitation Services.

(3) Whether Complainant was subjected to retaliation after January 2004 when following her complaints and refusal of the Chaplain's sexual advances, she was not given any major responsibilities, but given junior-level assignments; she was denied permission to acquire additional training necessary for advancement; she was required to write a letter of apology after she required compliance with Respondent's security policy; and on April 28, 2004, she was effectively demoted by being transferred to the *Superior Court At Risk Unit*.

## JURISDICTION

Respondent is the D.C. Government Agency charged with developing and administering a city-wide system of services for delinquency prevention and control to contribute to the protection of the community and the rehabilitation of the youth of the District of Columbia. Respondent provides security, supervision, residential and community support services for committed and detained juvenile offenders and juvenile persons in need of supervision. Respondent is located at Oak Hill Youth Center – Central Administration Building, 3201 Oakhill Road, Laurel, MD 20724. Respondent is not exempt, for any known reason, from the laws of the District of Columbia prohibiting discrimination. The alleged acts of discrimination claimed herein occurred in the District of Columbia. Therefore, Respondent is subject to the enforcement jurisdiction of the OHR.

## PROCEDURAL POSTURE

On August 30, 2004, Complainant filed a complaint at the OHR alleging retaliation and a hostile work environment. On August 29, 2006, the Office found probable cause to believe that Respondent retaliated against Complainant when in January 2004, after refusing and complaining about the Chaplain's sexual advances, she was not given any major responsibilities or assignments; given assignments which were not assigned to other supervisors; required to write a letter of apology; then on April 28, 2004, transferred to Superior Court At Risk Unit.

The Office also found no probable cause to believe that Complainant was subjected to a hostile work environment on the bases of sex (female); religion (Jehovah Witness); age (40); marital status (single); and family responsibilities (children) when allegedly: beginning April 2003, Respondent's Chaplain (male) sexually suggestive comments and advances; told her that she was going to hell because of her religion; questioned her about her familial status; and spoke negatively about her in front of others which made her feel uncomfortable.

Respondent moved this office to reopen the case because it allegedly did not get the opportunity to respond to the charges. In the interest of justice, this Office vacated the previous Letter of Determination and reopened the investigation. As a result of the reopening, the following is the Second Letter of Determination.

## FINDINGS OF FACT

The OHR's investigation of this matter included the Complainant's sworn complaint, Respondent's Position Statement, witness interviews, and documents submitted therewith. Based on its investigation, the OHR makes the following findings of fact.

## HOSTILE WORK ENVIRONMENT

### Complainant's Allegations

According to Complainant, she was hired by Respondent on January 14, 2003, as a Supervisory Correctional Officer, and performed her duties in a satisfactory manner. Complainant alleges that beginning in April 2003, Respondent's Chaplain (male) began making sexually suggestive comments and advances. Complainant claims that the Chaplain's approach was always sexual; he would often address her as "baby" when talking to her in front of others, giving the staff the impression that they were in a relationship. Complainant describes how the Chaplain always mentioned the word "booty" to her, and how he wanted the "booty."

Complainant alleges that she was touched inappropriately on her sides and waist by the Chaplain three (3) times a week starting in April 2003 and continuing through April 2004. Complainant states that the Chaplain would say each time, "Damn, that feels good." Complainant claims that she would immediately say, "no" or "stop", and the Chaplain would respond, "You got this job from me." Complainant asserts that the Chaplain touched her breasts a minimum of four (4) times in September 2003. Complainant continues that starting in April 2003 and continuing through January 2004, the Chaplain called her to his office on a regular basis (about every other day) and said, "Zina, look at you…your body looks so good. You know I want to eat your p…y, you know that." Complainant indicates that her typical response was, "Get away from me!" and he would say, "Okay, one day; one of these days." Complainant claims that at a minimum of three (3) times a week, as she was signing in (the sign-in sheets were right outside of the Chaplain's office), he would say, "Do you want to come and feel it?" On the first time, Complainant states that she asked, "Feel what?" and the Chaplain said as he pointed to his penis, "You know what. It's hard every time I see you." Complainant emphasizes that every time the Chaplain would walk past her, he would brush his hand against her butt and when she told him that she did not want him touching her, he said, "Well, it should not be out there." Other examples of sexual harassment cited by Complainant include the following: 1) In July 2003, the Chaplain would ask her daily when he could come over to her house and have sex with her; 2) in October 2003, he said that he heard she used to be a stripper and asked if she would strip for him; on one occasion, the Chaplain asked her to come to his office about a work related matter, and when she arrived, he pulled her to him, touching her back and waist, and said: "When are you going to let me eat that booty." Complainant claims that the Chaplain mentioned that he wanted her "booty" daily; and on several occasions, he would aggressively ask her to sit on his face.

Complainant also alleges that a Supervisory Corrections Officer harassed her on a daily basis, often stating, "I can't wait to eat your p...y," and "Can't I rub your butt?" Complainant claims that in June 2005, the Supervisory Corrections Officer said "You better hurry up and give me some p...y." Complainant opines that she felt threatened. Complainant claims that she reported the Supervisory Corrections Officer's harassing behavior to both the Assistant Superintendent and to the Superintendent (male) and that neither one did anything to improve the situation. Complainant claims that the Supervisory Corrections Officer told her that the Superintendent relayed her conversation to him and then said, "You don't know who you're messing with; anything you tell people, I'm going to find out." Complainant states that she reported the Supervisor's behavior a minimum of ten (10) times.

Complainant alleges that she was frightened of both the Chaplain and the Supervisory Corrections Officer because of their reputations for having sex with women when these women did not want to have sex with them. Complainant alleges that she could not sleep; she never wanted to go to work; and she was emotional and stressed all of the time. Complainant claims that she was constantly put down; she felt humiliated and disrespected; she was scared of being physically assaulted, and her car being vandalized. Complainant alleges that the Chaplain questioned her about her marital status, whether or not she was single and if she was in a relationship. Complainant claims that the Chaplain told her that he could help her and her family. Complainant explains that on many occasions, she carpooled with the Chaplain and his girlfriend to Respondent's site at Lorton; subsequently, the girlfriend died and Complainant believes that the Chaplain was now after her.

Complainant alleges that she was the youngest female supervisor at Oak Hill, and that she was not treated in the same manner as her similarly situated male employees or the older female employees. Complainant claims that she was not given major responsibilities or assignments and she was given assignments unlike those given other supervisors.

Complainant alleges that the Chaplain asked her to identify her religion, and when she told him that she was a Jehovah Witness, he became upset and told her that she was going to hell. Complainant states that the Chaplain told her that he had power within the Department; he and her supervisor (male) were good friends, and he was fully responsible for her supervisor obtaining his promotion.

**Respondent's Position**

Respondent posits that the Chaplain (no longer employed by Respondent), by virtue of his position, maintained a friendly rapport with youth served by the Agency, as well as many members of the staff, including Complainant. Respondent contends that conversations, if any, that would exceed the boundaries of collegial relationship were the result of a strong interest taken in staff and youth by the Chaplain because of his ministerial duties. Respondent contends that Complainant never informed her supervisor of the Chaplain's unwanted sexual advances; and she never informed her supervisor of the Chaplain's alleged wrongdoing.

Respondent contends that Complainant was not a victim of a hostile work environment, but instead was the architect of one; she had a demonstrated history of inappropriate behavior towards fellow staff. Respondent describes that during the month of April 2003, Complainant had three (3) complaints for abusive and inappropriate behavior filed by coworkers and subordinates, including a claim of sexual harassment.[2]

Respondent states that during 2004, it was an administration with the Department of Human Services known as the Youth Services Administration and DHS policies were in place when these alleged events occurred. Respondent proffers that DHS defines sexual harassment "as unwelcome advances, requests for sexual favors or any other verbal or physical conduct of a sexual nature when any one of the following criteria is present: 1) submission to a conduct is made either explicitly or implicitly a term or condition to a person's employment; 2) submission to or a rejection of such conduct by an individual is used as a basis for employment decisions affecting the individual; 3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment. Respondent claims that the policy is disseminated to employees by way of the Human Resources Office and postings displayed throughout the workplace and that each employee is provided a copy of the sexual harassment policy in writing as a condition to accepting employment.[3] Respondent indicates that as of June 2005, it had one case pending which had not been resolved and any matters pre-dating its establishment would be on file with DHS.

Respondent proffers that Complainant fails to allege any specific actions that were taken as a result of her marital or familial status; therefore, it cannot fully respond to this allegation. However, Respondent opines that based on the statements cited in the complaint, the alleged comments, if made, were so benign in nature that they did not contribute to a hostile work environment.

Respondent posits that Complainant was one of three (3) female Supervisory Correctional Officers (SCOs) who were all of similar age. Respondent explains that of the three (3) female SCOs, Complainant was the least tenured agency employee, but that she was in no way treated differently based on her age. Respondent asserts that Complainant was given responsibilities and assignments comparable to other SCOs without consideration of sex and age. Respondent opines that any restrictions on Complainant's duties that may have occurred were the result of inappropriate and unprofessional behavior demonstrated by Complainant.

Respondent indicates that the Chaplain denies ever making the comment that Complainant was going to hell because of her religion. Respondent posits that even if the statement was made, it was an isolated incident that was not severe or pervasive enough to adversely affect Complainant's work environment.

---

[2] a) Memorandum To: Superintendent; From: Supervisor Corrections Officer; Re: Sexual Harassment against Complainant; Date: April 9, 2003.
[3] Department of Human Services (DHS) Sexual Harassment Policy Statement

## Complainant's Rebuttal

Complainant details that beginning in April 2003, she began receiving repeated phone calls from the Chaplain asking her to leave her post and visit him in his office. Complainant describes that as time went on, the Chaplain became more and more aggressive with her, on the phone and in person, and his remarks to her became more and more inappropriate. For example, the Chaplain would: a) discuss having sex with her; b) refer to his penis when speaking with her; c) grab Complainant's waist, rear end, and breasts; and c) refer to her as "baby" in front of other employees.[4] Complainant continues that the Chaplain's behavior extended well beyond "collegial relationship." The Chaplain would invite her into his office, under the guise of spiritual counseling or praying together, where he would touch her inappropriately and make lewd comments about her physical appearance and his desire for a sexual relationship.

Complainant indicates that almost the entire time she was employed at Oak Hill, her direct supervisor was the Assistant Superintendent (male) who happened to be a close friend of the Chaplain.[5] Although aware of this close relationship, Complainant states that she had no choice, but to complain to her supervisor about the Chaplain's inappropriate behavior and sexual misconduct. Complainant states that she reported the Chaplain's behavior to her supervisor at least four (4) times verbally and once in writing. Complainant claims that the Assistant Superintendent's response was the following, "What do you want me to do about it?" Complainant alleges that the Assistant Superintendent never took any action to protect her, and in response to one of her complaints, he stated, "The only reason you are being harassed is because you don't give up no p...y; you should do it... the only reason you was brought here....because we heard you was a stripper in Lorton." Complainant states that she left the room crying. Complainant states that the Assistant Superintendent would ask her when she was going to strip for him, and then he would laugh. Complainant insists that the Assistant Superintendent witnessed the harassing behavior and, on one occasion, he called her into his office and the Chaplain was there as well. The Chaplain said to the Assistant Superintendent, "Man, don't you want to see how fat her booty is?" The Assistant Superintendent smiled and asked Complainant to sign her job performance rating. The Assistant Superintendent neither addressed the Chaplain's comment, nor did he investigate the Chaplain's harassment nor reprimand the Chaplain after witnessing his inappropriate remarks. Complainant states that she also reported the Chaplain's behavior to Respondent's Administrator of Operations (male), but he did not attempt to resolve these problems.

Complainant describes that when she first came to Oak Hill, she discovered that many of the COs were very "relaxed" when it came to following Oak Hill's rules and regulations. When Complainant was made a supervisor of one of the units, she made certain that the rules and regulations were followed, particularly when it came to security at the facility. Complainant's strict adherence to the rules resulted in complaints from one or two of the COs under her command. Complainant received one performance evaluation of

---

[4] Complainant's Affidavit, sworn to, on September 17, 2007.
[5] The Chaplain told Complainant that he was responsible for her supervisor having his job at Oak Hill. *Id*

"Excellent" while employed at Oak Hill. One of her subordinates for two years, a Correctional Officer, described Complainant as "...qualified, competent and professional." After only a few months at Oak Hill, Complainant's supervisor informed her that she was doing such a good job that he was considering promoting her. Complainant submits that even the D.C. Department of Employment Services found that she was "Not Discharged for Misconduct."[6]

Complainant contends that Respondent's list of several incidents from her work history allegedly supporting her transfer to the *Superior Court At Risk Unit* is flawed. First, the majority of the alleged conduct occurred after her April 28, 2004 transfer date. Second, the sexual harassment complaint was filed by the Chaplain's close friend after Complainant informed her supervisor of the Chaplain's sexual harassment. This sexual harassment complaint was immediately dismissed as baseless. Third, Complainant explains that Respondent relied on the manufactured complaints of the Chaplain's volunteers which were in response to Complainant's compliance with Oak Hill's security regulations requiring all visitors to have the proper identification before entering the facility. Moreover, Complainant insists that the fact that her supervisor required her to write a letter of apology regarding this matter is further evidence of the unequal treatment she received at Oak Hill. To Complainant's knowledge, no other SCO or CO was ever asked to perform the degrading task of writing an apology for protecting the safety of the children at Oak Hill. Finally, Complainant asserts that Respondent's additional arguments regarding her work performance were never substantiated and never resulted in a formal complaint or suspension.

Complainant insists that as several witnesses attested, Oak Hill's environment was toxic. Witnesses described "rampant sexual harassment;" the absence of any formal ethics advisor, complaint procedure or sexual harassment training at Oak Hill; rampant fraternization among COs, SCOs, and other supervisors at Oak Hill; the recent adoption of sexual harassment training and "rampant and uncontrolled sexual harassment" at Oak Hill from 2003- 2005; and verbal threats and harassment by employees. Even Respondent's Director admitted in 2006 that he was "deeply committed to reforming this long-troubled department."[7]

Complainant states that a SCO at the facility (and eventually the Superintendent) also participated in her harassment; in addition to asking Complainant to have sex with him, he verbally harassed Complainant on numerous occasions. Complainant asserts that she complained about the Supervisory Corrections Officer's sexual harassment to her supervisor, the Assistant Superintendent Operations, several times. Complainant states that on one occasion, the Superintendent met with her and her supervisor to discuss the problem, but no action was taken against the SCO in response to her complaints. Following the meeting, the SCO told her that he had heard that she was complaining about him, and he said: "I'm going to get you. Maybe not now, but I'm going to get you." The SCO's harassment of Complainant was witnessed by other employees; and as

---

[6] D.C. Department of Employment Services Determination by Claims Examiner, on May 24, 2006.
[7] 10/26/2006 Email From: Respondent's Director; To: Wilson Greene

a result, he harassed other employees. Complainant opines that due to her supervisor's inaction, and after receiving this threat, she stopped making regular complaints.

Complainant states that when she asked her supervisor why she had not received a Shift Commander assignment, he told her that it was because she was "too young." Because there was no regulation placing a minimum age requirement on the Shift Commander position, Complainant asserts that she was denied advancement because of her age. Complainant describes that on more than one occasion, the Chaplain chided her about her religion, reminding her that she was going to Hell and that Jehovah's Witnesses were a "cult." This treatment added another layer of stress and strain upon Complainant. Complainant adds that because she was a single mother, the harassment against her was even worse. The Chaplain targeted Complainant because she was single. The Chaplain remarked that because Complainant did not have a husband, he could "be there for [her]." The Chaplain also emphasized that because Complainant had children, he could take care of her and the kids financially.

Complainant asserts that she was subjected to a hostile work environment nearly the entire time she was employed at Oak Hill. As a result of verbal harassment and physical abuse, she was severely stressed and depressed, and dreaded coming to work. Complainant claims that because she was constantly degraded and humiliated, she was unable to be intimate with her partner and had problems communicating with her children. Complainant insists that while being employed at Oak Hill, she feared being physically assaulted, having her car vandalized, not being promoted and not getting new assignments.

**Witness Statements**

In an interview with one of Complainant's former co-workers, a Lead Correctional Officer, he stated that he had never worked with the Chaplain, but had seen him around. The Lead CO indicated that he was neither aware of any relationship between Complainant and the Chaplain nor was he aware of the Chaplain sexually harassing Complainant.[8] The witness stated that Complainant was an outstanding worker who often went over and beyond her call of duty, and what was required of her. However, the witness indicated that he did not know whether Complainant was treated the same way or differently from the other supervisors (male, older females).[9]

In her sworn Affidavit,[10] a Youth Treatment Specialist states that for over a year, beginning March 2003, when Complainant walked past their offices, the Chaplain would jump up and follow her down the hall. On many occasions, the Chaplain would regularly put his hand around Complainant's waist when stopping to talk to her. Complainant confided in her regarding the Chaplain's continuous harassment; and Complainant was distraught and emotionally scarred by this experience. The Youth Treatment Specialist adds that the Chaplain also sexually harassed her while she worked at Oak Hill; he often told her that she was attractive and that she would "make a nice preacher's wife." The

---

[8] An Interview with Complainant's Witness on July 26, 2006.
[9] Complainant claimed that she was the youngest female supervisor at Oak Hill.
[10] Affidavit of Correctional officer, Youth Treatment Specialist, dated September 17, 2007

Chaplain's behavior made her uncomfortable and nervous. The Youth Treatment Specialist details pervasive sexual harassment at Oak Hill; during the period 2003 through 2005, sexual harassment was rampant and uncontrolled at Oak Hill. Any time a new female employee joined the Oak Hill staff, the male employees would take bets on who would have sex with her first. The Youth Treatment Specialist asserts that it was only within the last year that there was sexual harassment training or any rules or regulations advising employees of what was appropriate or inappropriate conduct.

A former Correctional Officer (CO), in his Affidavit,[11] corroborated that there was widespread sexual harassment at Oak Hill from 2003-2005. Supervisors would make inappropriate comments to corrections officers and other female employees about their physical appearance. In addition, he was asked to retaliate against a female employee who reported sexual harassment; and he was aware of the Chaplain harassing women and overheard complaints to that effect. The CO stated that Complainant was qualified, competent and professional; she performed her duties "by the book." The CO continued that he had no personal knowledge of any formal complaints raised by senior management against Complainant, or any conduct by Complainant that would justify suspension, reprimand, or termination.

## RETALIATION

### Complainant's Allegations

Complainant claims that in October 2003, she first complained to her supervisor about the Chaplain's behavior, but no action was taken in response. Complainant claims that she complained again in January 2004 to her supervisor about the Chaplain's behavior and again no action was taken.

Complainant alleges that when she rebuffed the sexual advances of the Chaplain, and informed him that his behavior was not welcome, she was retaliated against by Respondent. Complainant alleges that she was not given any major responsibilities as the other male supervisors. Complainant claims that the Chaplain told the supervisor where to place staff on assignments and she was given assignments not assigned to other supervisors or she was not given any assignments, which led staff to believe that she was being given special treatment. Complainant claims that she was denied training and she was always placed in uncomfortable environments.

Complainant alleges that all other supervisory correctional officers were given shift commander positions and only reassigned when given a promotion. Complainant claims that she was reassigned a total of thirteen (13) times during her tenure with Respondent, and she was never given the option to be a shift commander. Complainant alleges that she was required to write a letter of apology for something she did not do. Complainant further alleges that on April 18, 2004, she was eventually transferred to the *Superior Court at Risk Unit.*

---

[11] Affidavit of a former Correctional Officer, supervised by Complainant during 2004-2005, dated September 13, 2007.

## Respondent's Position

Respondent contends that even if the alleged conversations had occurred, which it does not concede, the Chaplain lacked the power and ability to influence Complainant's work assignments. Respondent asserts that it was Complainant's professional behavior that caused changes in her work assignments. Respondent explains that a review of Complainant's reveals that she was 1) disciplined for "insubordination";[12] 2) disciplined for "dishonesty";[13] 3) disciplined for insensitive comments made to the faith-based community partners; 4) had a grievance filed against her by a union member (Fraternal Order of Police) for unprofessional behavior;[14] and 5) had a complainant filed for sexual harassment.[15]  Respondent posits that Complainant's own behavior often necessitated that she be placed on work assignment that limited her contact with certain staff.[16]

Respondent addresses the specific claims (transfer to the *Superior Court at Risk Unit* and being required to write a letter of apology) listed in Complainant's complaint. Respondent posits that the transfer of Complainant was in no way retaliation, but was the combination of agency staffing pressures and Complainant's work performance at Oak Hill Youth Center. Respondent's Acting Superintendent (male) indicates that the former Acting Deputy of Secure Programs (male) made the decision to reassign Complainant, and Complainant was assigned to the juvenile At-Risk Unit in the D.C. Superior Court Building.[17]  The Acting Superintendent continues that Complainant was frequently observed at the Central Administration Building (CAB) at Oak Hill Youth Center, when she was supposed to be on duty at the At-Risk Unit.

Respondent acknowledges that Complainant was required to write a letter of apology, but notes that she was required to do so as a result of inappropriate and unprofessional behavior. Respondent claims that on two occasions, Complainant made statements found to be offensive by members of the faith-based community that partner with Respondent. Respondent continues that as a result of inappropriate behavior found to be offensive by community members Respondent had enlisted to enhance its ability to serve youth, Complainant was informed that she would be required to issue a letter of apology. Respondent stresses that Complainant never in fact, wrote the letter as ordered.

Respondent posits that the matters enumerated in the complaint have not been stated with adequate specificity to substantiate Complainant's claim; Complainant failed to inform her supervisor or any of Respondent's management of the alleged behavior directed towards her.

---

[12] Memorandum To: Complainant; From: Deputy Administrator for Secure Programs; Date: May 23, 2003; Subject: Violation of the District Personnel Manual Chapter 16 Notice of Emergency and Proposed Rulemaking, D.C. Law 12-124 Insubordination, Dishonesty.
[13] *Id*
[14] Memorandum To: Acting Superintendent; From Chairman Fraternal Order of Police FOP/DHS; Re: The Fraternal Order of Police (FOP) is filing a grievance Step II on behalf of a Correctional Officer
[15] Refer to Footnote No. 3
[16] 21 March 2003 Memorandum To: Complainant; From: Assistant Superintendent, Operations; Re: Clarification of Duties and Responsibilities.
[17] Respondent's Acting Superintendent's Declaration, Sworn on 11/02/2005, filed in Docket No. 05-320 DC(CN).

Respondent asserts that the majority of instances cited as retaliation by Complainant were in fact mandated by her unprofessional behavior, which was often found to border on harassment by her colleagues. Respondent proffers that taking into consideration Complainant's work performance, unprofessional behavior, and lack of information to corroborate the five (5) alleged grounds, it contends that Complainant was not subjected to discrimination and a hostile work environment during April 01, 2003 through April 18, 2004.

## Complainant's Rebuttal

Complainant asserts that other than for work-related reasons, she denies being absent from her post. Complainant states that she did not go to the CAB while she was supposed to be on duty at the *At Risk Unit* in Washington, D.C., except for related reasons. Complainant explains that she went to the CAB once a week for staff meetings with her direct supervisor from the beginning of 2003 to November 2005, to fill out time sheets and incident reports; to go with another employee purchase supplies for the children; to get gas for the work vehicle; to work on administrative projects; for colleagues' birthdays (for which she claims she was in charge of purchasing cakes); committee meetings about the new facility; and on occasion, for social visits during her lunch break.

Complainant claims that she was not loud or abrasive with the faith-based volunteers. Complainant explains that on one occasion, she did not allow them to enter the Oak Hill Youth Center because they did not have proper volunteer identification. Complainant asserts that she was following facility security policy. Complainant indicates that aside from a warning she received for missing a supervisors meeting in June 2005, she was never given written or verbal reprimands regarding her performance. Complainant states that her evaluation was excellent.

Complainant explains that she was given junior-level assignments, which prevented her from acquiring training necessary for her advancement, and was subjected to continued harassment. Because the Chaplain was extremely influential at Oak Hill and had a close relationship with the Assistant Superintendent, Complainant's work assignments deteriorated once she started complaining to her supervisor about the Chaplain. Among the most egregious examples were the following: a) repeated reassignment; b) constant monitoring of movements on and off premises; c) Respondent's refusal to respond to requests for maintenance and assistance in Complainant's unit; and d) Respondent's refusal to incorporate Complainant's recommendations for improving Oak Hill. Moreover, Complainant was never assigned to the Shift Commander position at Oak Hill. Often, SCOs (and even COs) with less experience than Complainant were assigned to the Shift Commander position during the period, 2004 to 2006.

Complainant states that her supervisor had informed her that he was not going to do anything about the Chaplain's behavior and that she would have to handle it herself. When Complainant informed her supervisor that she was going to file a formal charge of harassment against the Chaplain, the supervisor told Complainant that if she did that, she would "suffer the consequences." Complainant claims that shortly after this exchange in April 2004, she was transferred to the *At Risk Unit*, which would mean that Respondent

chose to place a poor employee in charge of an insufficiently-staffed unit designed to treat children with special needs. Complainant asserts that her assignment to the *At Risk Unit* was a demotion; among other things, she went from supervising 12-15 staff members to supervising four (4); she no longer had an office; she no longer had access to a government car; she worked more hours for the same pay; had to pay for parking at the courthouse; and she had to endure less opportunities for development and advancement.

## Witness Statements

Complainant's witness in the interview opined that Complaint's performance was outstanding, and he guessed that people felt threatened about that. The witness indicated that Complainant was transferred to the *Superior Court at Risk Unit* because she posed a threat to Respondent's administration.[18]

The Corrections Officer, in his statement,[19] attests that it was common practice for Corrections Officers and SCOs to work as Shift Commanders during the 2004 to 2006 timeframe. The CO describes that on May 5, 2006, Respondent's Superintendent ordered the Acting Shift Commander to 'find something to write the [CO] up for,' so that the Superintendent could fabricate a reason to terminate him; the Superintendent then specifically instructed the Acting Shift Commander to write him up for abandonment of post, without provocation.

## STANDARD OF REVIEW

In this forum, in order for Complainant to prevail, the OHR's record must contain credible, probative and substantial evidence from which a reasonable person would conclude that Complainant met the *prima facie* elements of discriminatory or retaliatory behavior, and that a legitimate, nondiscriminatory explanation for the behavior does not exist. 4 DCMR § 715.1; 4 DCMR § 499.1. In cases alleging a hostile work environment, the OHR's record must contain credible, probative and substantial evidence from which a reasonable person would find that the *prima facie* elements of a hostile work environment existed and that the Respondent is either not entitled to an affirmative defense or that the OHR's record contains insufficient evidence to support Respondent's affirmative defense. *Id.*

## LEGAL ANALYSIS

## HOSTILE WORK ENVIRONMENT

The District of Columbia Human Rights Act ("DCHRA") makes it unlawful to "...discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's age, race, color, religion, sex or national origin," among other protected categories. D.C. Official Code § 2-1402.11(a)(1) (2001 Edition). It is substantially similar to Title VII. *Howard v. Best*, 484 A.2d 958, 977 (D.C. 1984). "In interpreting [the Human Rights Act, the Court of

---

[18] See Footnote No. 1.
[19] See Footnote No. 11

Appeals has] generally looked to cases from the federal courts involving claims brought under the Civil Rights Act of 1964 for guidance...." *Wallace v. Skadden, Arps, Slate, Meagher & Flom, et al.*, 715 A.2d 873, 889, n.31 (D.C. 1988).

Both Title VII and the DCHRA recognize *quid pro quo* and hostile work environment as two (2) distinct theories of sexual harassment. *Quid pro quo* harassment claims are based on threats to take some employment action against an employee who does not succumb to a request for a sexual favor, which is ultimately carried out. Hostile work environment claims are premised on unwanted attention or sexual remarks that are sufficiently severe or pervasive to alter the conditions of the victim's employment. *Burlington Indus. v. Ellerth*, 524 U.S. 742, 751 (1998). The legal standard the court applies differs as to each theory of sexual harassment. "When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable...For any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe or pervasive." *Id.* at 753-54.

A Complainant may establish a *prima facie* case of hostile work environment if she can demonstrate that: (1) she is a member of a protected class; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on membership in her protected class; (4) the harassment is severe or pervasive enough to affect a term, condition, or privilege of her employment; and (5) the employer knew or should have known of the harassment, but failed to take any action to prevent the harassment.[20] *Pegues v Mineta, Secretary, US Department of Transportation*, 2006 US Dist LEXIS 59118 (DC 2006) Unwelcome harassment is conduct that the employee neither solicited nor invited and that the employee regarded as undesirable or offensive. *Daka, Inc. v. Breiner*, 711 A.2d 86 (D.C. 1998). In determining the degree of severity or pervasiveness of hostility, the test is whether working conditions have been discriminatorily altered. *Id.* at 92 (citing *Howard Univ. v. Best*, 484 A.2d 958, 978 (D.C. 1984) and *Harris v. Forklift Sys.*, 510 U.S. 17 (1993)). "More than a few isolated incidents must have occurred, and genuinely trivial occurrences will not establish a *prima facie* case. However, no specific number of incidents, and no specific level of egregiousness need be proved. The trier of fact should consider the amount and nature of the conduct, the plaintiff's response to such conduct, and the relationship between the harassing party and the plaintiff." *Daka*, 711 A.2d at 93. When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris*, 510 U.S. at 17, 21. Whether an environment is hostile or abusive is determined by the totality of the circumstances, such as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance. The effect on the employee's psychological well-being may be considered, but the employee need not prove psychological injury. *Id.* at 23.

---

[20] This fifth element applies to non-supervisor harassment.

## Supervisor Liability

In the District of Columbia, an employer may not be held liable for a supervisor's hostile work environment harassment, not resulting in a tangible employment action, if the employer is able to establish that it adopted policies and implemented measures such that the victimized employee either knew or should have known that the employer did not tolerate such conduct and that she knew or should have known that she could report the harassment to the employer without fear of adverse consequences and the employee's conduct in not seeking relief pursuant to the policy was unreasonable. *Faragher v. Boca Raton*, 524 U.S. 775 (1998); *Ellerth*, 524 U.S. at 742; *Gary v. Long*, 59 F.3d 1391, *cert. den.* 516 U.S. 1011 (D.C. Cir. 1995). Additionally, where Complainant seeks to hold an employer liable for the conduct of an employee, Complainant must also establish *respondeat superior* liability. *Raymond v. U.S. Capitol Police Bd.*, 157 F. Supp. 2d 50, 57-58 (D.D.C. 2001).

According to the Equal Employment Opportunity Commission ("EEOC") and related case law, when harassment by a supervisor creates an unlawful hostile environment, but does not result in a tangible employment action, the employer can raise an affirmative defense to liability or damages, which it must prove by a preponderance of the evidence. The defense consists of two (2) necessary elements:

> (a) the employer exercised reasonable care to prevent and correct promptly any harassment; and (b) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

A tangible employment action constitutes an "official act of the enterprise" or other wielding of "company" authority that "significantly changes" Complainant's employment status. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 144 (2004) (citing *Ellerth*, 524 U.S. at 761). Such actions include a(n): "humiliating demotion; extreme cut in pay; transfer to a position in which Complainant would face unbearable working conditions;" "fail[ure] to promote, reassignment with significantly different responsibilities; or [other] decision causing a significant change in benefits." *Id.* at 134, 144. In other words, such an employment action amounts to actions by a supervisor, who "has been empowered by the company as...[an] agent to make economic decisions affecting other employees under his or her control." *Suders*, 542 U.S. at 144 (citing *Ellerth*, 524 U.S. at 762). By nature, these actions are typically "documented in official company records," and "may be subject to review by higher[-]level supervisors." *Id.* at 144-45. In essence, such "official" action shows "beyond question" that the employer "has used his managerial or controlling position to the employee's disadvantage." *Suders*, 542 U.S. at 148 (citing *Ellerth*, 524 U.S. at 760).

If an employer can prove that it discharged its duty of reasonable care and that the employee could have avoided all of the harm but unreasonably failed to do so, the employer will avoid all liability for unlawful harassment. If an employer cannot prove that it discharged its duty of reasonable care and that the employee unreasonably failed to

avoid the harm, the employer will be liable. For example, if unlawful harassment by a supervisor occurred and the employer failed to exercise reasonable care to prevent it, the employer will be liable even if the employee unreasonably failed to complain to management or even if the employer took prompt and appropriate corrective action when it gained notice. *See, e.g., EEOC v. SBS Transit, Inc.*, No. 97-4164, 1998 WL 903833 at *1 (6th Cir. Dec. 18, 1998) (unpublished) (lower court erred when it reasoned that employer liability for sexual harassment is negated if the employer responds adequately and effectively once it has notice of the supervisor's harassment; that standard conflicts with affirmative defense which requires proof that employer "took reasonable care to prevent and correct promptly any sexually harassing behavior and that the plaintiff employee unreasonably failed to take advantage of preventative or corrective opportunities provided by the employer").

The first prong of the affirmative defense requires a showing by the employer that it undertook reasonable care to prevent and promptly correct harassment. Such reasonable care generally requires an employer to establish, disseminate, and enforce an anti-harassment policy and complaint procedure and to take other reasonable steps to prevent and correct harassment. The EEOC artfully details that there are no "safe harbors" for employers based on the written content of policies and procedures. Even the best policy and complaint procedure will not alone satisfy the burden of proving reasonable care if, in the particular circumstances of a claim, the employer failed to implement its process effectively. *See Hurley v. Atlantic City Police Dept.*, No. 96-5634, 96-5633, 96-5661, 96-5738, 1999 WL 150301 (3d Cir. March 18, 1999) ("*Ellerth* and *Faragher* do not, as the defendants seem to assume, focus mechanically on the formal existence of a sexual harassment policy, allowing an absolute defense to a hostile work environment claim whenever the employer can point to an anti-harassment policy of some sort;" defendant failed to prove affirmative defense where it issued written policies without enforcing them, painted over offensive graffiti every few months only to see it go up again in minutes, and failed to investigate sexual harassment as it investigated and punished other forms of misconduct.).

For example, if the employer has an adequate policy and complaint procedure and properly responded to an employee's complaint of harassment, but management ignored previous complaints by other employees about the same harasser, then the employer has not exercised reasonable care in preventing the harassment. *See Dees v. Johnson Controls World Svs.*, 168 F.3d 417, 422 (11th Cir. 1999) (employer can be held liable despite its immediate and appropriate corrective action in response to harassment complaint if it had knowledge of the harassment prior to the complaint and took no corrective action). Similarly, if the employer has an adequate policy and complaint procedure, but an official failed to carry out his or her responsibility to conduct an effective investigation of a harassment complaint, the employer has not discharged its duty to exercise reasonable care. Alternatively, lack of a formal policy and complaint procedure will not defeat the defense if the employer exercised sufficient care through other means.

**Complainant demonstrates that Respondent subjected her to a hostile work environment based on her sex (female).**

Complainant establishes a *prima facie* case. Complainant satisfies the first element in that she is a female. Complainant also satisfies the second element. Since the burden of this element is not onerous, the OHR credits Complainant's accusation that she was subjected to unwelcome harassment. Conduct is unwelcome when the employee did not solicit or invite the conduct or the employee regards the conduct as undesirable or offensive. Complainant allegedly suffered unwelcome harassment when Respondent's Chaplain made sexually suggestive comments and advances; and when the Supervisory Corrections Officer also made sexually suggestive comments and advances. And, if taken as true, Complainant has demonstrated that the comments were based on her membership in her protected class.

Complainant establishes the fourth element that the harassment was severe and pervasive enough to affect a term or condition of employment. The OHR's record contains not only Complainant's allegations about the harassment, but witnesses' statements that there was rampant sexual harassment at Oak Hill during that time frame, and specifically, the Youth Treatment Specialist's witnessing the Chaplain constantly putting his arms around her waist while talking to her and following Complainant down the hall. Complainant describes that she was touched inappropriately on her sides and waist by the Chaplain three (3) times a week staring in April 2003 and continuing through April 2004; he touched her breasts at least four (4) times in September 2003; and starting in April 2003, and continuing through January 2004, the Chaplain made inappropriate sexual advances and comments towards her. Further, Complainant alleges that the Supervisor Corrections Officer harassed her on a daily basis. Complainant alleges that she was frightened of both the Chaplain and the Supervisor Corrections Officer because of their reputations for having sex with women when these women did not want to have sex with them.

As a result, Complainant alleges that she could not sleep; she never wanted to go to work; and she was emotional and stressed all of the time. Complainant claims that she was constantly put down; she felt humiliated and disrespected; she was frightened of the prospect of physical assault and her car being vandalized. Complainant describes and her witness buttresses her allegations of the harassment by the Chaplain and the Supervisory Corrections Officer that this harassment unreasonably interfered with Complainant's work performance. Complainant claims that she complained several times to her supervisor and Respondent's Superintendent, but to no avail.

Based on the totality of the circumstances, Respondent cannot claim an affirmative defense. As noted *supra,* an employer may avoid liability in hostile work claim if the following is present: (a) the employer exercised reasonable care to prevent and correct promptly any harassment; and (b) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Respondent's Sexual Harassment Policy was put in place on November 12, 2004, following the Mayor's Order of October 20, 2004, and training was only carried

out within the last year as confirmed by the Youth Treatment Specialist. Complainant alleges that her harassment began in 2003, before that policy was established. Second, although Respondent denies Complainant's accusations, the OHR finds credible that she complained to Respondent's Supervisory CO and nothing was done. As such, Complainant satisfies her claim of a hostile work environment based on sex.

***Complainant does not demonstrate that Respondent subjected her to a hostile work environment based on her age (40 years), religion (Jehovah Witness), marital status (single) and family responsibilities (children).***

Complainant meets the first element because Complainant is forty (40) years old, single, a Jehovah's Witness and has children. Complainant meets the second element because she alleges that she was subjected to unwelcome harassment. Allegedly, the Chaplain told her that she was going to hell because of her religion; questioned her about her familial status; and spoke negatively about her in front of others. If taken as true, at least some of the statements were based on Complainant's membership in her protected classes.

But, Complainant's claim of a hostile work environment based on religion, age, marital status and family responsibilities must fail because Complainant does not demonstrate that this unwelcome harassment was severe and pervasive enough to affect a term or condition of employment. As noted *supra*, in determining the degree of severity or pervasiveness of hostility, the test is whether working conditions have been discriminatorily altered. "More than a few isolated incidents must have occurred, and genuinely trivial occurrences will not establish a *prima facie* case. The trier of fact should consider the amount and nature of the conduct, the plaintiff's response to such conduct, and the relationship between the harassing party and the plaintiff. The OHR must review the totality of the circumstances, such as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance. Based on the comments above, Complainant does not demonstrate that her work environment was altered based on these specific comments. (emphasis added) As best, Complainant has demonstrated that she was subject to offensive utterances. As such, her claim of a hostile work environment based on religion, age, marital status and family responsibilities must fail.

## RETALIATION

The District of Columbia Human Rights Act ("DCHRA") provides that "it shall be an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having [either] exercised or enjoyed or...aided or encouraged any other person in the exercise or enjoyment of any right granted or protected" under this Act. *D.C. Official Code § 2-1402.61* (2001 Ed.).

The District of Columbia Court of Appeals enunciated the elements of a *prima facie* case of retaliation in *Arthur Young & Co. v. Sutherland*, 631 A.2d 354 (D.C. 1993); *see also, Goos v. Nat'l Ass'n of Realtors*, 715 F. Supp. 2 (D.D.C. 1989). Particularly, an employee

must demonstrate that: 1) she engaged in a protected activity; 2) the employer took materially adverse action against her; and 3) a causal relationship exists between the protected activity and the "materially adverse" action. *Arthur Young*, 631 A.2d at 368, n.28; *Burlington Northern & Santa Fe Ry. v. White*, 2006 U.S. LEXIS 4895, *26.

A protected activity for purposes of the DCHRA, need not take the form of a lawsuit or of a formal complaint to an enforcement agency. To the contrary, the protections of the Act extend to an employee's informal complaints of discrimination to his superiors within the organization. *Carter-Obayuwana v. Howard Univ.*, 764 A.2d 779, 790 (D.C. 2001); *Civil Rights Act of 1964*, 42 U.S.C.A. 2000e-3. Aiding or encouraging any other person in the exercise or enjoyment of any right under the DCHRA is also a protected activity. *D.C. Official Code § 2-1402.61* (2001 Ed.).

Under the DCHRA, Title VII, and related case law, the prohibited materially adverse employment action in retaliation cases not only includes tangible action affecting the terms and conditions of employment (i.e., "significant change[s] in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," etc.), but also extends to any employment action that may "dissuade a reasonable worker from making or supporting a charge of discrimination," except "trivial harms." *Arthur Young*, 631 A.2d at 368, n.31 (citing *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir.1985)); *Brown v. Brody*, 339 U.S. App. D.C. 233, 199 F.3d 446, 456 (D.C. Cir. 1999) (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1999)); *White*, 2006 U.S. LEXIS 4895, *26-27 (citing *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Thus, a "materially adverse" employment action, within the meaning of this standard, constitutes any action that may possibly "deter victims of discrimination from complaining to the EEOC...," according to the reactions of a reasonable employee.[21] *White*, 2006 U.S. LEXIS 4895, *28 (citing *2 EEOC 1998 Manual § 8*, pp. 8-13). The *White* court stressed the importance of broadening the scope of the materially adverse act with regard to the anti-retaliation provision at issue (contrasted with adverse employment acts cited in the accompanying anti-discrimination provision),[22] thereby "prevent[ing] harm to individuals based on what they do, i.e., their conduct." *White*, 2006 U.S. LEXIS 4895, *18-25. However, "petty slights, minor annoyances, and simple lack of good manners" are usually insufficient to trigger such deterrence, so as to meet the materially adverse requirement. *Id.* at *28. Further, because the significance of any retaliatory act will most likely depend upon the particular circumstances of each case, an "act that would be immaterial in some situations[,]...[may be] material in others." *White*, 2006 U.S. LEXIS 4895, *29-30. (citing *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005)). In determining whether an employment action is "materially adverse," within the

---

[21] Allowing this standard to solely apply to the reactions of a "reasonable" employee provides for an objective, "judicially administrable" standard by which to judge whether an act is "materially adverse," within the meaning of this standard. *White*, 2006 U.S. LEXIS 4895, *28.

[22] Specifically, in *White*, the court contrasted the purpose, and hence scope, of the substantive anti-discrimination provision of Title VII versus the accompanying anti-retaliation provision of this Title. *White*, 2006 U.S. LEXIS 4895, *18-25; *See also*, 42 U.S.C.A. 2000e-2(a); but *see contra.*, 42 U.S.C.A. 2000e-3(a) (emphasis supplied).

meaning of this standard, courts need not consider "the nature of the discrimination that led to the filing of the charge." *White*, 2006 U.S. LEXIS 4895, *30.

An employee may establish a causal link between his protected activity and the adverse action, i.e., an inference of retaliation, by showing that his employer was aware of his protected activity and that the adverse action occurred shortly thereafter. *Mitchell*, 759 F.2d at 86. The temporal proximity between the statutorily protected activity and the adverse action must be "very close" to establish a causal connection. *Hammond v. Chao*, 383 F. Supp. 47, 59 (D.D.C. 2005) (quoting *Clark County School District v. Breeden* 532 US 268 (2001). For example, "courts generally have accepted [as a causally sufficient] time[,] periods of a few days up to a few months and seldom have accepted time lapses outside of a year in length." *Davis*, 355 F. Supp. 2d at 352 (quoting *Brodetski*, 141 F. Supp 2d at 35, 43. The *Davis* Court stressed that lengths of time that are far too great, without other evidence, fail to demonstrate a causal link. See, e.g., *Buggs*, 293 F. Supp. 2d at 148-49 (citing numerous cases that support the conclusion that the time separation here between a protected activity and a plaintiff's non-selection for a position is insufficient to support a finding of a causal connection).

If an employee successfully establishes a *prima facie* case of retaliation, the burden shifts to the employer to articulate a legitimate reason for taking the adverse action. If the employer does so, the burden shifts back to the employee to prove that the articulated reason is pretext for retaliation. *Burdine*, 450 U.S. at 256. In order for Complainant to prevail on his claim of retaliation in this forum, the OHR's record must contain credible, probative, and substantial evidence from which a reasonable trier of fact would conclude that the *prima facie* elements of a case of retaliation are present and that no legitimate, nondiscriminatory explanation for the action exists.

### Complainant demonstrates that she was subjected to retaliation by Respondent.

Complainant alleges that she was subjected to retaliation in January 2004, when as a result of refusing and/or complaining to her supervisor about the Chaplain's sexual advances, she was not given any major responsibilities, but only junior-level assignments; she was required to write a letter of apology after requiring compliance with Respondent's security policy; and she was effectively demoted on April 28, 2004 when she was transferred to the *Superior Court At Risk Unit*.

Complainant satisfies the first element of a *prima facie* case of retaliation that she complained to her supervisor about the Chaplain's harassment. Complainant claims that she complained about the harassment to her supervisor in October 2003 and January 2004. After she complained, Complainant alleges that Respondent retaliated against her by effectively demoting her on April 28, 2004. The alleged demotion constitutes a materially adverse employment action that would dissuade a reasonable employee from filing a claim. Complainant satisfies the third element because the temporal proximity between her protected activity and the adverse action is very close, about four (4) months. In addition, the OHR finds that Respondent was aware of the harassment. We note that it

is Respondent's position that Complainant never informed her supervisor of any alleged unwanted sexual advances by the Chaplain or the Supervisory Corrections Officer.

But, Respondent's position is not credible. Although the OHR record does not contain documented evidence of Complainant's complaints, it does contain statements from several witnesses who observed incidents of sexual harassment to Complainant and other employees by the persons named by Complainant. In fact, witnesses made statements that "sexual harassment was rampart" in Respondent's facility. Also, at least one of the sexual harassers was a supervisor and supervisors are charged with the responsibility of knowing the laws prohibiting harassment and of insuring that the workplace is free of harassment.

Respondent attempts to articulate a legitimate non-discriminatory reason for its actions against Complainant. It contends that any restrictions on Complainant's duties that may have occurred were the result of inappropriate and unprofessional behavior demonstrated by Complainant. However, in view of the aforementioned witness corroborations and a witness statement corroborating Complainant's allegation that she was transferred because she posed a threat to Respondent's administration, the OHR finds that Respondent's position is lacking credible, probative and substantial evidence to overcome the inference of retaliation. Complainant successfully establishes a case for retaliation against Respondent.

## CAUSE DETERMINATION

For the foregoing reasons:

1. The OHR finds **"PROBABLE CAUSE"** to believe that Respondent subjected Complainant to a hostile work environment on the basis of her basis of sex (female) beginning April 2003, Respondent's Chaplain (male) made sexually suggestive comments and advances.

2. The OHR finds **PROBABLE CAUSE** to believe that Complainant was subjected to retaliation when in January 2004, after refusing and complaining about the Chaplain's sexual advances, she was not given any major responsibilities or assignments; required to write a letter of apology; then on April 28, 2004, transferred to *Superior Court At Risk Unit*.

**IT IS SO ORDERED.**

The Respondent is requested to notify this Office within fifteen (15) days after receipt of this Determination as to whether said Respondent is prepared to pursue conciliation of this matter. Otherwise, failure to respond or to respond in the affirmative will result in this Office processing this case for summary determination or a hearing before an independent hearing examiner pursuant to Sections 109 and 110 of the District of Columbia Municipal Regulations Governing Complaints of Discrimination in the District of Columbia Government. 4 DCMR §§ 109, 110 (2005). Further, all parties are advised

that if conciliation is not accomplished within twenty (20) days from receipt of this letter, the subject case will be scheduled for summary determination or hearing.

## NO CAUSE DETERMINATION

For the foregoing reasons:

1. The OHR finds **NO PROBABLE CAUSE** to believe that Complainant was subjected to a hostile work environment on the bases of religion (Jehovah Witness); age (40); marital status (single); and family responsibilities (children) when allegedly: beginning April 2003, told her that she was going to hell because of her religion; questioned her about her familial status; and spoke negatively about her in front of others.

**IT IS SO ORDERED.**

## RIGHT TO APPLY FOR RECONSIDERATION

Complainant may apply for reconsideration pursuant to 4 DCMR § 114.3. Such application along with all supporting documentation must be submitted to the Director of the Office of Human Rights in writing **within fifteen (15) days from the following date** _____2 / 9 /08_____.

The grounds for reconsideration are limited to: new evidence, misapplication of laws, or misstatement of material facts. The request must, therefore, be based on one or more of these grounds. If the request is not based on one of these grounds, or not timely filed, it will be subjected to dismissal. **COMPLAINANT MUST INCLUDE ALL SUPPORTING DOCUMENTATION AND REASONS FOR THE APPEAL IN THE ORIGINAL REQUEST FOR RECONSIDERATION.** This Office will forward a copy of any request for reconsideration along with all supporting documentation to the other party for a response.

If the Complainant does not file a request for reconsideration with OHR, this letter constitutes a final decision from OHR. Complainant has three (3) years from the date of this decision to file a petition for review with the Superior Court of the District of Columbia.

## RIGHT TO SUBSTANTIAL WEIGHT REVIEW

As a Complainant you have the right to a "Substantial Weight Review" from the U.S. Equal Employment Opportunity Commission (EEOC). To obtain a Substantial Weight Review, you must, within fifteen (15) calendar days. Send your written request to: State

and Local Coordinator, EEOC, 1801 L Street, N.W., Suite 100, Washington, D.C. 20507-1002.

Sincerely,

Gustavo F. Velasquez
Director

cc:   D.C. Department of Youth Rehabilitation Services
     Attn: EEO Officer
     Oak Hill Youth Center- Central Administration Building
     3210 Oak Hill Road
     Laurel, MD 20724

     Andrea Comentale, Esq.
     Acting Chief, Personnel and Employment
     Office of the Attorney General for the District of Columbia
     441 4th Street, NW-Suite 1060 North
     Washington, DC 20001

Exhibit 2

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Zina Hunter<br>1227 Larchmont Avenue<br>Capital Heights, MD 20743 | From: | Washington Field Office<br>1801 L Street, N.W., Suite 100<br>Washington, DC 20507 |
|---|---|---|---|

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) | |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 10C-2004-00331 | David Gonzalez,<br>State & Local Coordinator | (202) 419-0714 |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ] While reasonable efforts were made to locate you, we were not able to do so.

[ ] You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[ ] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[X] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt **of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Dana R Hutter*

Dana Hutter,
Director

**NOV 19 2007**

*(Date Mailed)*

Enclosures(s)

cc:     Vincent N. Schiraldi
        D.C. Department Of Youth Rehabilitation
        1000 Mount Olivet Road, NE
        Washington, DC 20002

        Victor Glasberg, Esq.
        121 South Columbus Street
        Alexandria, VA  22314

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Zina D. Hunter<br>1227 Larchmont Avenue<br>Capital Heights, MD 20743 | From: | Washington Field Office<br>1801 L Street, N.W., Suite 100<br>Washington, DC 20507 |
|---|---|---|---|

|  | ☐ | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | | |
|---|---|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 10C-2005-00267 | David Gonzalez,<br>State & Local Coordinator | (202) 419-0714 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

## - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_Dana R. Hutter_                                         NOV 19 2007

**Dana Hutter,**
**Director**                                             (Date Mailed)

Enclosures(s)

cc:
**Vincent N. Schiraldi**
**D.C. Dept. Of Youth Rehabilitation**
**1000 Mount Olivet Road, N.E.**
**Washington, DC 20002**

**Victor Glasberg, Esq.**
**121 South Columbus Street**
**Alexandria, VA 22314**